IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| APACHETA CORPORATION,<br>A CALIFORNIA CORPORATION<br><br>Plaintiff,<br><br>v.<br><br>LINCARE, INC.,<br>A DELAWARE CORPORATION<br><br>Defendant. | No. 2:16-cv-02030-BMS |

**APACHETA CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

For the reasons set forth in the accompanying brief, Plaintiff, Apacheta Corporation ("Apacheta"), hereby moves for summary judgment on Apacheta's breach of contract claim, as well as on Defendant's affirmative defenses.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| APACHETA CORPORATION,<br>A CALIFORNIA CORPORATION<br><br>Plaintiff,<br><br>v.<br><br>LINCARE, INC.,<br>A DELAWARE CORPORATION<br><br>Defendant. | No. 2:16-cv-02030-BMS |

**PLAINTIFF APACHETA CORPORATION'S
STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Apacheta Corporation ("Apacheta") submits this statement of undisputed facts in support of its Motion for Summary Judgment pursuant to this Court's Order dated March 22, 2017 (ECF 23) and Federal Rule of Civil Procedure 56.

**I.  Apacheta and Lincare Negotiated and Executed a Software License and Services Agreement**

1. Apacheta provides mobile software applications used in the transportation and delivery of goods. (Complaint ¶ 7; Answer ¶ 7.)

2. Lincare supplies and delivers home medical equipment. (*See* Dep. of L. Reid at 39:13-15, relevant excerpts of which are attached hereto as **Exhibit 1**.)

3. On December 15, 2014, Lincare and Apacheta entered into a written "Software License and Services Agreement" (the "Agreement"). (Dep. Ex. 2, Agreement, attached hereto as **Exhibit 2**; Dep. of L. Reid at 16:14-18.)

4. Gary Wolsiefer, Lincare's Director of Information Technology, as expressly authorized by Shawn Schabel, Lincare's COO, executed the Agreement on behalf of Lincare.

1

(Agreement, at 7, 16; Dep. of G. Wolsiefer at 12:6-16, attached hereto as **Exhibit 3**; Dep. of L. Reid at 17:6-9; 17:17-19.)

5. Both Messrs. Wolsiefer and Schabel, as Lincare's Director of IT and Lincare's COO, respectively, reviewed the technical aspects of the Agreement before signing. (Dep. of G. Wolsiefer at 18:3-9.)

6. Moreover, Lincare's internal legal counsel also reviewed the Agreement and its terms prior to execution. (Dep. of G. Wolsiefer at 16:15-18.)

## II.  Project Background and Pre-Contractual Demonstrations

7. Lincare's interest in an Apacheta software solution arose after Mr. Schabel, COO, instructed Mr. Wolsiefer to investigate the Apacheta software in April 2014. (Dep. of G. Wolsiefer at 12:17-24, 14:5-7; Dep. of L. Reid at 25:8-19; Dep. Ex. 32, Email from J. Wee to G. Wolsiefer dated Apr. 8, 2014, attached hereto as **Exhibit 4**.) As part of Mr. Wolsiefer's research, James Wee, Vice President of Business Development at Apacheta, sent Mr. Wolsiefer a "white paper" on April 8, 2014 describing the Apacheta software. (Dep. Ex. 93, "Delivering Superior Patient Care Using Mobility Solutions for HME/DME," attached hereto as **Exhibit 5**; Dep. of G. Wolsiefer at 13:11-14:6; Dep. of J. Wee at 81:9-83:9, relevant excerpts of which are attached hereto as **Exhibit 6**.)

8. As confirmed by Mr. Wolsiefer and Kent Hermes, Lincare's Manager of IT Development, representatives from Apacheta visited Lincare's offices in Tampa, Florida at least twice in 2014 prior to the Agreement's execution for meetings and demonstrations of the basic functionality of the Apacheta software application. (Dep. of G. Wolsiefer at 15:12-16:4; Dep. of K. Hermes at 10:1-16, attached hereto as **Exhibit 7**.) These demonstrations were given using a "live nonproduction system." (Dep. of J. Wee at 152:24-153:7.)

2

9. Among other things, these pre-contractual demonstrations included discussions between Lincare and Apacheta about route optimization, and Apacheta showcased the software's ability in this regard by demonstrating how the software could visualize stops on a map, which would allow a dispatcher to manually create routes and sequence the order of stops along a delivery route. (Dep. of J. Wee at 143:8-155:23.)

10. According to Mr. Wolsiefer, Lincare was satisfied that the functionality of Apacheta's software would be able to meet Lincare's needs. (Dep. of G. Wolsiefer at 16:5-8; Dep. of K. Hermes at 11:5-8.) At no point pre-contractually did Lincare express that the level of route optimization offered by the Apacheta software would be insufficient for Lincare's needs. (Dep. of J. Wee at 157:2-10.)

11. Satisfied that the Apacheta software would meet Lincare's needs, Lincare began contract negotiations with Apacheta in the summer of 2015. (*See, e.g.*, Dep. of J. Wee at 83:22-84:6.)

### III. The Agreement

#### A. Applicable law, term, and payment

12. The Agreement contains a Pennsylvania choice of law provision. (Agreement at 7, § 9.12.)

13. The Agreement was for an initial three-year term, commencing on the Effective Date of December 15, 2014:

> **5.1 Term**. Unless otherwise indicated in Exhibit A, the term of this Agreement begins on the Effective Date and continues for a period of three (3) years thereafter, unless terminated sooner in accordance herewith (the "Initial Term"). Thereafter, this Agreement will renew for additional one year terms (each a "Renewal Term", and collectively with the Initial Term the "Term") unless Customer provides written notice to Apacheta of its intent to terminate this Agreement at least ninety (90) days' prior to the state of any Renewal Term.

(Agreement at 3, §§ 5.1, 5.2; *see also* Dep. of G. Wolsiefer at 28:6-11; 31:9-16.)

14. Mr. Wolsiefer—Lincare's Director of IT, the project's IT sponsor, and the authorized signer of the Agreement on behalf of Lincare—anticipated that Lincare would "use the [software] until it didn't meet [Lincare's] needs anymore, if that was the case." (Dep. of G. Wolsiefer at 30:21-31:6; Dep. of L. Reid at 25:8-19.)

15. The Agreement provided for an annual $750,000 licensing and maintenance fee, which fee Lincare had negotiated down from a proposed higher rate. (Agreement, at 8; Dep. Ex. 7, Email from G. Wolsiefer to J. Wee dated Nov. 7, 2014, attached hereto as **Exhibit 8** (Mr. Wolsiefer writing to Apacheta: "[Mr. Schabel's] take is that we need to be at more like 750k per year for licensing to make this work."); Dep. of L. Reid at 51:18-52:10; Dep. of G. Wolsiefer at 19:7-20:8.)

16. Mr. Wolsiefer understood that the first year's payment of $750,000 would be prorated, followed by fees of $750,000 in both years two and three. (Dep. of G. Wolsiefer at 30:21-31:6.)

17. Gregg Timmons, Apacheta's CEO, confirms that Apacheta expected to be paid at least $750,000 per year over the course of three years, and that this annual fee would not decrease even if Lincare's user count decreased. (Dep. of G. Timmons at 81:8-82:6, 102:1-16, relevant excerpts of which are attached hereto as **Exhibit 9**.)

18. Moreover, internal Apacheta documents confirm that it expected to be paid at least $750,000 per year over the course of three years. (*See* Email from A. Maddalone to D. Grust, dated March 5, 2015 (attaching spreadsheet titled "Copy of HME Customer List 5 Mar 2015.xlsx"), attached hereto as **Exhibit 10**; Email from A. Maddalone to G. Timmons, dated

4

Oct. 20, 2015 (attaching spreadsheet titled "HME Customer List 30Sept 2014.xlsx"), attached hereto as **Exhibit 11**.)[1]

19. It is undisputed that, to-date, Lincare has paid Apacheta just $52,500 in connection with the Agreement, which amount was for professional services. Lincare has paid no portion of any of the annual license and maintenance fees. (Dep. of G. Timmons at 195:12-16, 271:7-13; Dep. of L. Reid at 253:2-4.)

### B. Review and Acceptance of Deliverables

20. The Agreement specifies the services Lincare contracted Apacheta to provide and the manner in which Lincare would review and approve these services, which were specified as project Deliverables. (Agreement at 3, § 4.1 (defining Statement of Work).)

21. All such Deliverables were set forth in the Agreement's Statement of Work, which is Exhibit C to the Agreement. (Agreement at 13-16; Dep. of L. Reid at 57:8-14.)

22. The parties agreed to the manner in which Deliverables would be accepted by Lincare, including that Deliverables that were not rejected would be deemed accepted 15 days after delivery:

> **4.3 Acceptance of Deliverables.** Each SOW will describe, if applicable, the deliverables that Apacheta is obligated to furnish to Customer hereunder (collectively, the "Deliverables") and the acceptance criteria for each of the Deliverables, if applicable (the "Acceptance Criteria"). ***Unless set forth otherwise in a SOW, each Deliverable shall be deemed accepted fifteen (15) days after delivery by Apacheta to Customer (the "Acceptance Date.")***.

(Agreement at 3, §4.3 (emphasis added).)

23. Lincare's Federal Rule of Civil Procedure 30(b)(6) designee, Linda Reid, admits that the language contained in the Acceptance and Deliverables section of the Agreement is clear. (Dep. of L. Reid at 65:16-67:6 ("Q. And that's pretty easy to understand. You would

---

[1] Per agreement with Lincare's counsel, irrelevant confidential customer information was redacted from these documents prior to production.

agree that if Lincare received the deliverable and didn't reject that deliverable within 15 after receipt, it would beed accepted, right?  A.  Yes.  I don't agree with contracts being written this way, but I understand that this was written this way.").)

24. Moreover, the parties agreed that "[i]n the event that Customer [Lincare] rejects a Deliverable (i) Customer ***will set forth in writing and in reasonable detail, the reason for the rejection*** and (ii) Apacheta shall use commercially reasonable efforts to correct such Deliverable in a timely manner."  (Agreement at 15, § 2.3 (emphasis added).)

### C. **Termination and Notice**

25. The Agreement contains conditions precedent to termination:

**5. Term and Termination**

\*\*\*

**5.2 Termination on Breach**. If either Party breaches any term of this Agreement, the other Party may terminate this Agreement ***following thirty (30) days' written notice to the breaching Party specifying any such breach unless, within the period of such a notice, all breaches specified therein are remedied***.  If the breach is one which, by its nature, cannot be fully remedied in thirty (30) days, the Parties shall cooperate to prepare a mutually acceptable plan to cure the breach within such thirty (30) day period and then pursuant to which, the breaching Party shall undertake reasonable, diligent and good faith efforts to promptly remedy the breach.  If the Parties are unable to agree upon a plan to remedy the breach within such thirty (30) day period, the non-breaching Party may terminate this Agreement.  If, after the Parties have agreed upon a remedial plan, the breaching Party fails to comply with such plan, the non-breaching Party may thereafter terminate this Agreement effective on written notice.

(*Id.* at 3, §§ 5.1, 5.2 (emphasis added).)

26. With regard to notices, the Agreement provides:

**9.2 Notices**. Any notice required or permitted under the terms of this Agreement or required by law ***must be made in writing*** and must be (a) delivered in person, (b) sent by first class registered mail, or air mail, as appropriate, or (c) sent by overnight air courier, in each case properly posted and fully prepaid to the appropriate address set forth below.

(*Id.* at 6, § 9.2 (emphasis added).)

27. As the Agreement was being negotiated, the parties (through their respective legal counsel at the time) specifically discussed and reviewed the Agreement's termination provision prior to execution. (*See* Dep. Ex. 8; Dep. of L. Reid at 54:22-55:3; Dep. of G. Wolsiefer at 21:11-18; 25:3-8; 25:16-26:1; 33:10-25.)

28. There is no dispute that the Agreement's termination provision is clear and unambiguous. Indeed, Lincare's 30(b)(6) witness, Ms. Reid, admits that the section of the contract titled "termination and breach" is clear and not confusing. (Dep. of L. Reid at 145:12-146:22.)

29. Mr. Wolsiefer also agrees that Section 5.2 is "very clear and understandable . . ." and means "in layman's terms, it appears to me that if either party breaches the agreement, that the other party can terminate the agreement with a 30-days written notice, and that the breaching party has 30 days within that notice to remedy the breach." (Dep. of G. Wolsiefer at 32:19-21; 35:11-19.)

**IV. Lincare-Caused Delays and Significant Turnover in Lincare Leadership**

30. The project began in January 2015 by way of a kickoff meeting. The kickoff meeting was intended to introduce the teams and assign project managers and was the first step in starting the project's inception phase under the Agreement. (Dep. of G. Wolsiefer at 36:11-24; Dep. of L. Reid at 70:7-71:5.)

31. As Lincare confirms, the next step after the kickoff meeting was to develop a statement of work, which would be a written document in the form of functional specifications. Part of the process of developing this document was understanding what, if any, customization requirements Lincare would have for Apacheta's software. That process was to then be followed

by development, beta testing, and deployment of the software. (Dep. of K. Hermes at 13:24-15:24.)

32. Before the project could progress much at all, Mr. Schabel, COO of Lincare and the project's executive sponsor, left Lincare in February 2015 and was replaced by Greg McCarthy on March 1, 2015. Mr. McCarthy did not, however, learn of the project or the Agreement until the summer of 2015, and even then only "at a high level." (Dep. of L. Reid at 26:15-27:8; Dep. of G. McCarthy at 6:13-21, 7:24-8:11, attached hereto as **Exhibit 12**.) Indeed, Mr. McCarthy had not been involved in pre-contractual negotiations or the drafting of the Agreement. (Dep. of G. McCarthy at 7:7-11.)

33. Around the same time, Tom Byrnes, who had been CEO of Lincare when the Agreement was executed, left Lincare and was replaced by Kristen Hoefer on March 1, 2015. (Dep. of L. Reid at 67: 17-68:14; Dep. of G. McCarthy at 15:3-8.) Ms. Hoefer was new to Lincare and also therefore had not been involved in pre-contractual negotiations or the drafting of the Agreement. (Dep. of G. McCarthy at 15:3-5.)

34. Already as of July 30, 2015, the project was three to four months behind the proposed project timeline, and as Mr. Wolsiefer, Lincare's Director of IT at the time, admits, Lincare was the sole cause of this delay. Indeed, Mr. Wolsiefer even proposed internally on that date that Lincare should pay Apacheta an additional fee because of the delay. He also acknowledged at the time that Apacheta had "been a good partner" thus far. (Dep. Ex. 13, Email from G. Wolsiefer to K. Hermes dated July 30, 2015, attached hereto as **Exhibit 13**; Dep. of G. Wolsiefer at 42:8-45:1.)

35. Other key Lincare employees, including Kent Hermes, Lincare's Manager of IT Development (who was second-in-command under Mr. Wolsiefer and who was considered the

"lead on the project"), agreed with Mr. Wolsiefer's assessment of the delays and Apacheta's role as a good partner. (*See, e.g.*, Dep. Ex. 11, Email from K. Hermes to G. McCarthy dated Aug. 31, 2015, attached hereto as **Exhibit 14** (writing that Apacheta had "been excellent to work with in spite of our delays."); Dep. of K. Hermes at 21:22-24; 28:8-9, 34:5-9; Dep. of B. Marshall at 10:22-11:2, attached hereto as **Exhibit 15** (Hermes was "lead"); Dep. of R. Batezel at 13:7-11, relevant excerpts of which are attached hereto as **Exhibit 16** (same).)

36. Then, on July 31, 2015, Mr. Wolsiefer himself retired as Lincare's Director of IT, which he has explained was due, at least in part, to Lincare's hiring of a new CEO and the fact that Lincare appeared to be heading in a "new direction." (Dep. Ex. 12, Email from K. Hoefer to "Colleagues" dated July 24, 2015, attached hereto as **Exhibit 17**; Dep. of G. Wolsiefer at 8:18-9:19; Dep. of L. Reid at 18:24-19:1, 37:8-11, 95:10-12; *see also* Dep. of G. McCarthy at 9:9-10:23.)

37. Then, in late September 2015, Mr. Hermes (who had been the "lead on the project" for Lincare) was terminated by Lincare. (Dep. of K. Hermes at 5:18-6:14.)

## V. Lincare Expressed No Concerns About Apacheta's Work

### A. Lincare Had No Complaints About Apacheta or Its Work, Generally

38. On July 24, 2015, Lincare's new CEO (Ms. Hoefer) issued a company-wide report about the project between Lincare and Apacheta, reporting that the project was ongoing, with expected roll-out in mid-2016. In her July 24, 2015 report, Ms. Hoefer did not identify any issues or deficiencies surrounding the project. (Dep. Ex. 12; Dep. of L. Reid, at 97:19-98:15.)

39. As noted, as of July 30, 2015, Mr. Wolsiefer believed that Apacheta had "been a good partner" on the project, despite Lincare's own delays. (Dep. Ex. 13; Dep. of G. Wolsiefer at 42:8-45:1.)

40. And Mr. Wolsiefer testified that at the time he left Lincare at the end of July 2015, he had no reason to believe that Apacheta could not deliver or was not willing to deliver an acceptable solution to Lincare. (Dep. of G. Wolsiefer at 45:2-14.) Nor did he have any reason to think Apacheta would be terminated from the project, nor had he ever heard anyone make such recommendations internally at Lincare. (*Id.* at 51:24-52:21.)

41. Likewise, Mr. Hermes testified that he continued to believe that Apacheta was a good partner at the time he left Lincare in late September 2015. He had never had any complaints about the quality of Apacheta's work, and he believed that Apacheta was fully performing under the Agreement. (Dep. of K. Hermes at 15:25-19:24; 29:10-30:8.) And as with Mr. Wolsiefer, no one at Lincare had ever expressed to Mr. Hermes that Apacheta had violated or been in breach of the Agreement. (Dep. of K. Hermes at 38:24-39:14.)

42. Moreover, in late September 2015 (after Messrs. Wolsiefer and Hermes had left Lincare), a live demonstration was held to review the software. As Lincare reported internally, "[t]he demo was well received by the operations team." (Dep. Ex. 15, Email from R. Batezel to G. McCarthy dated Sept. 24, 2015, attached hereto as **Exhibit 18**; Dep. of L. Reid at 112:19-114:18.)

**B.  Lincare Had No Complaints About the Development of the Functional Specifications, Specifically**

43. As mentioned, during the project's initial phase, the parties worked on developing functional specifications, and these specifications went through multiple versions and iterations. (*See, e.g.*, Dep. of R. Batezel at 23:17-22.)

44. The functional specifications were intended to define "all functionality of the system" and, once approved, Apacheta would base all coding work needed to build Lincare's custom development needs on these documents. (Dep. of G. Wolsiefer at 49:8-50:19; Dep. of B.

Marshall at 16:1-6, 17:20-18:2, 31:16-32:1; Dep. Ex. 14, Email from B. Marshall to B. Hoy et al. dated Aug. 28, 2015, attached hereto as **Exhibit 19**; Dep. Ex. 19, Email from C. Forgeng to R. Batezel et al. dated Oct. 5, 2015, attached hereto as **Exhibit 20**.[2])

45. Prior to his termination by Lincare, Mr. Hermes had been involved in reviewing these draft functional specifications, and based on his review, he expected that the project would be successfully completed. In fact, Mr. Hermes's view as of September 2015 was that Apacheta's software would meet Lincare's needs, and "that the statement of work we had hammered out could be successfully completed and the application would work as defined." Mr. Hermes was surprised to learn later that the project had been terminated by Lincare. (Dep. of K. Hermes at 15:25-19:24.)

46. According to Barnes Marshall, Lincare's Senior Software Developer at the time, the late September 2015 live demonstration of the software was only possible "because the scope of the project had been well-defined that . . . this is the work that will be done from an IT perspective, from a technical perspective, and . . . at this point there would be no major missing gaps . . . as far as major functionality goes." (Dep. of B. Marshall at 21:23-22:4; 22:16-23:4.)

47. On September 24, 2015, Mr. McCarthy, Lincare's COO, asked Mr. Marshall for "a brief update on where we stand on [the project] and the next milestone[.]" On September 24, 2015, Rob Batezel, IBMI Development Manager at Lincare, reported to Mr. McCarthy that Lincare was "currently finalizing the specification with Apacheta," by which he meant the functional specifications, and that Lincare "expect[ed] to have that wrapped up by next week." Mr. Batezel reported that after the functional specifications were finalized, Lincare would "give Apacheta the OK to move forward with making our custom changes to their applications." Mr. Batezel did not suggest or identify for Mr. McCarthy any alleged problems or deficiencies with

---

[2] The three attachments to this email have been redacted from Exhibit 20 due to their length (296 pages).

Apacheta's software or the project at the time. (Dep. Ex 15; Dep. of L. Reid at 114:19-24; Dep. of R. Batezel at 19:5-23.)

## VI. Linda Reid Was Hired at Lincare and Immediately Explored Terminating Apacheta

48. On October 1, 2015, Linda Reid joined Lincare and assumed the new role of Head of Application Technology. As part of her role, she took over some of Mr. Wolsiefer's prior responsibilities as Director of IT. (Dep. of L. Reid at 18:24-19:1, 37:12-17, 95:10-12, 116:11-14; *see also* Dep. of G. McCarthy at 13:12-18; Dep. of R. Batezel at 20:23-21:1.)

49. Between the time of Mr. Wolsiefer's and Mr. Hermes's departures and the time of Linda Reid's arrival in early October 2015, there had been a gap in project leadership at Lincare. (Dep. of B. Marshall at 11:8-19; Dep. of R. Batezel at 13:25-14:7 (explaining that he was the contact person for the project during this period).)

50. Within 48 hours of joining Lincare, Ms. Reid requested information from the Lincare project team about the termination provisions of the Agreement. Ms. Reid was informed that "[t]he termination clause is 30 days written notice, but the termination events are limited." (Dep. Ex 16, Email from M. Moore to L. Reid dated Oct. 3, 2015, attached hereto as **Exhibit 21**; Dep. of L. Reid at 132:24-134.)

51. According to Mr. McCarthy, Lincare's COO, within one week of Ms. Reid's arrival, she had told him that she "was not a big supporter of Apacheta" based on her purported "previous experience" and that Lincare "should look at other options." (Dep. of G. McCarthy at 17:5-18:20; *see also* Dep. Ex. 21, Email from G. McCarthy to L. Reid dated Oct. 7, 2015, attached hereto as **Exhibit 22**; )

52. According to Ms. Reid, she first reviewed the Agreement's termination provisions in mid-October 2015. (Dep. of L. Reid at 138:13-25.)

12

## VII. Apacheta Delivered, and Lincare Failed to Timely Reject, the Final Functional Specifications

53. On October 5, 2015, Apacheta sent three sets of functional specifications to Lincare (the "October 5, 2015 Deliverable"). The transmittal email's subject line read: "Updated Functional Specs for your review and approval." (Dep. Ex. 19; Dep. of L. Reid at 85:16-25.)

54. According to Cora Forgeng, Apacheta's Project Manager, when she delivered the October 5, 2015 Deliverable, she believed them to be in final form, subject only to minor revision of the variety that is standard during software projects. (Dep. of C. Forgeng at 136:9-137:9, relevant excerpts of which are attached hereto as **Exhibit 23**; *see also* **Declaration of C. Forgeng ¶ 5.**)

55. And as Ms. Forgeng explains, at the time the October 5, 2015 Deliverable was sent to Lincare, Apacheta was ready and able to fully deliver the software solution to Lincare based on these specifications. (Decl. of C. Forgeng ¶ 7.)

56. In fact, over the course of the project, up to and including the date of delivery of the October 5, 2015 Deliverable, no one at Lincare had ever communicated to Ms. Forgeng that Lincare believed the Apacheta software was incompatible in any manner with Lincare's business. (Dep. of C. Forgeng at 186:21-187:8.)

57. According to Mr. Batezel, IBMI Development Manager at Lincare, the plan internally at Lincare was to review the October 5, 2015 Deliverable to make sure that "the changes that Apacheta is going to make to their side are going to interface properly to our side." (Dep. of R. Batezel at 23:3-11.)

58. Lincare admits that it was aware that Apacheta believed the October 5, 2015 Deliverable to be final and that Apacheta was requesting that Lincare review and approve this

Deliverable. (Dep. of L. Reid at 223:16-20; *see also* Dep. Ex. 52, Email from C. Forgeng to R. Batezel et al. dated Oct. 9, 2015, attached hereto as **Exhibit 24** (noting under the heading "10/9/15 Lincare – Weekly Status Meeting Notes" that "[o]n Tuesday, 10/5/15, final functional specifications were sent for Lincare approval").)

59. Lincare acknowledges that it was contractually obligated to review and either approve or reject the October 5, 2015 Deliverable. (Dep. of L. Reid at 179:14-17; 185:8-13.)

60. Lincare confirms that it was in a position to review the October 5, 2015 Deliverable at the time it was delivered, and in fact, that Lincare did begin that review. (Dep. of L. Reid at 91:16-23.)

61. Indeed, Lincare informed Apacheta during an October 9, 2015 Weekly Status Meeting (and then continued to report the same for several weeks thereafter), that it was reviewing the October 5, 2015 Deliverable. (Dep. Ex. 20, Email chain from C. Forgeng to R. Batezel et al. containing "Weekly Status Meeting Notes" for the period Oct. 9, 2015 through Dec. 11, 2015, attached hereto as **Exhibit 25**; Dep. of L. Reid at 223:21-23; *see also* Dep. of B. Marshall at 29:4-16 (confirming the accuracy of the Weekly Status Meeting Notes).)

62. This pattern continued for weeks, with Lincare taking no action to reject the October 5, 2015 Deliverable or to notify Apacheta that the Deliverable was deficient or insufficient in any manner. (Dep. of L. Reid at 175:1-6.)

63. The reason for Lincare's delays is now known: In October 2015, Ms. Reid had told the Lincare team to cease all work on the project. (Dep. of R. Batezel at 27:7-17; Dep. of B. Marshall at 34:7-35:19, 39:16-22.)

64. Yet no one at Lincare told Apacheta of this work stoppage. In fact, even as late as December 4, 2015, no such word had been passed to Apacheta. (Dep. of B. Marshall at 34:7-35:19, 39:16-22.)

65. Regardless, as of October 20, 2015, fifteen (15) days following Apacheta's delivery to Lincare of the October 5, 2015 Deliverable, Lincare had not taken any action to reject the Deliverable, whether by providing Apacheta with written notice of rejection (as required by the Agreement) or otherwise. (Dep. of L. Reid at 172:5-16.)

66. And it was not until November 16, 2015, that Lincare's executive management informed Apacheta by email that Lincare's executive team had "not yet reviewed" the October 5, 2015 Deliverable. Notably, this email did not identify any deficiencies or gaps in the October 5, 2015 Deliverable. (Dep. Ex. 22, Email from G. McCarthy to G. Timmons dated Nov. 16, 2015, attached hereto as **Exhibit 26**; Dep. of L. Reid at 188:18-189:3; Dep. of G. McCarthy at 22:4-23:13.)

**VIII. On February 1, 2016, Lincare Rejected the October 5, 2015 Deliverable and Terminated the Agreement**

67. Mr. Wolsiefer confirms that at no point while he was at Lincare did he notify Apacheta that it was in breach of any of its contractual allegations, nor did he ever hold the view that Apacheta was ever in breach, nor did anyone at Lincare ever suggest to him that Apacheta was ever in breach. (Dep. of G. Wolsiefer at 35:21-36:10.)

68. And Lincare's 30(b)(6) witness, Ms. Reid, also confirms that at no point during the course of the project did Lincare provide formal written notice to Apacheta that it was in breach of any term of the Agreement. (Dep. of L. Reid at 147:10-148:15, 151:2-4, 154:2-3, 248:8-15.)

69. Yet in early November 2015, Ms. Reid recommended internally at Lincare that the project be terminated. (Dep. of L. Reid at 221:14-23; *see also* Dep. of R. Batezel at 26:19-27:6.)

70. In fact, Ms. Reid at around this time had begun the process of soliciting and assessing software offered by other vendors, ranking those products, and making a decision to switch to a different vendor and product. (*See* Dep. of L. Reid at 226:2-18, 229:11-17, 232:23-233:12.)

71. Mr. McCarthy, Lincare's COO, does not recall being part of any conversations or discussions about providing written notice to Apacheta of any breach or about providing Apacheta with any opportunity to cure any purported breach. (Dep. of G. McCarthy at 30:13-31:3.)

72. In early November 2015, Apacheta's CEO, Gregg Timmons, wrote to Lincare's COO, Greg McCarthy, to inquire on the status of the project and why Lincare had not formally signed-off on the October 5, 2015 Deliverable. Mr. McCarthy's response failed to suggest any problem and made no mention of Lincare's intention to terminate the Agreement. (Exhibit 27.)

73. Then, on February 1, 2016, nearly four months after receiving the October 5, 2015 Deliverable, Lincare's executive management team sent a letter to Apacheta rejecting the October 5, 2015 Deliverable and formally terminating the Agreement ("Termination Letter"). The full text of the Termination Letter is simply this:

> Dear Gregg:
>
> Reference is made to our recent email communication exchange regarding the current status of the project. As you know, the project included Apacheta's submission of proposed requirements for the software's development, such requirements to be subject to the Lincare's acceptance. Lincare has reviewed the proposed requirements as well as its own expectations of the software's functionality. While Lincare appreciates (and understands it has paid for) the work Apacheta has provided Lincare during the project's inception phase to date, after further review, Lincare has determined such requirements do not, and given the inherent limitations in the project, will not meet Lincare's needs. As such, Lincare does not see a path forward with Apacheta on this project.
>
> Thank you for your consideration. Feel free to contact me if you would like to discuss this matter further.

(Dep. Ex. 28, Letter from G. McCarthy to G. Timmons dated Feb. 1, 2016, attached hereto as **Exhibit 27**; *see also* Dep. of L. Reid at 218:8-16 ("Q: So I take it this is the official termination letter? A: Yes.").)

74. The Termination Letter purported to (a) reject the October 5, 2015 Deliverable and (b) terminate the Agreement and, thus, the project. (Dep. Ex. 28.)

75. As Lincare acknowledges, however, at no time prior to this February 1, 2016 Termination Letter had Lincare formally rejected the October 5, 2015 Deliverable, nor had Lincare ever provided Apacheta with written notice of a rejection, let alone a written explanation of the reasons why this Deliverable was unacceptable or an opportunity for Apacheta to cure any alleged (unidentified) issues. (Dep. of L. Reid at 176:22-177:4, 223:24-225-22; Dep. of G. McCarthy at 32:1-4.)

76. Moreover, as Lincare also acknowledges, the Termination Letter was the first and only time Lincare communicated its intent to terminate the Agreement; the Termination Letter did not allege that Apacheta was in breach of the Agreement, nor did it identify a breach by Apacheta; and Lincare thus did not provide Apacheta with the chance to cure any breach as none

17

was identified. (Dep. of L. Reid at 147:10-148:15, 151:2-4, 154:2-3; 206:13-207:2, 210:22-211:7, 224:17-225:22, 248:8-15.)

77. Lincare has since hired a different software vendor to replace Apacheta and has refused to pay Apacheta any amount for software license and maintenance fees under the Agreement. (Dep. of L. Reid at 226:7-18, 253:2-4.)

Dated this 11th day of September, 2017.

Respectfully submitted,

  */s/ Gregory J. Star*
DRINKER BIDDLE & REATH LLP
Gregory J. Star, PA Bar I.D. 89389
Alex H. Hayden, PA Bar I.D. 314445
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996
(215) 988-2734 phone
(215) 988-2757 fax
Gregory.Star@dbr.com
Alex.Hayden@dbr.com

*Attorneys for Plaintiff, Apacheta Corporation*

# **CERTIFICATE OF SERVICE**

I, Gregory J. Star, do hereby certify that a true and correct copy of **APACHETA CORPORATION'S MOTION FOR SUMMARY JUDGMENT** and **STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT** was served on the following by means of the Court's electronic filing system:

Matthew A. Lipman, Esq.
James T. DiMarco, Esq.
MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
1617 John F. Kennedy Blvd., Suite 1500
Philadelphia, PA  19103-1815
mlipman@mdmc-law.com
jdimarco@mdmc-law.com

*Attorneys for Defendant, Lincare Inc.*

Dated:  September 11, 2017           *s/ Gregory J. Star*
                                     Gregory J. Star