IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| APACHETA CORP., | : | |
|     Plaintiff. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| LINCARE, INC., | : | No. 16-2030 |
|     Defendant. | : | |

# MEMORANDUM

**Schiller, J.**                                                                                          **November 30, 2017**

    Apacheta Corp. and Lincare, Inc., entered into a contract under which Apacheta agreed to develop software for Lincare. The parties spent nearly a year on the software development process, which was delayed due to leadership changes at Lincare and discussions between the parties regarding Lincare's dissatisfaction with the software. Lincare, however, ultimately terminated the contract. Apacheta then sued for breach of contract, claiming in part that Lincare had violated the contract's right-to-cure provision. Before the Court are the parties' cross-motions for summary judgment. Because genuine issues of material fact remain, both motions are denied.

## I.     BACKGROUND

### A.     The Agreement

    Apacheta, a software development company, entered into a contract with Lincare, a home medical equipment provider, to develop software to manage Lincare's delivery system. (Apacheta's Stmt. of Undisputed Facts ¶¶ 1–3.) Lincare expected the software to allow it to move from a paper-based delivery system to a digital, tablet-based system, with features such as electronic forms and delivery route management. (Lincare's Stmt. of Undisputed Facts ¶ 5.)

The parties signed a written agreement with an integration provision. (Compl. Ex. 1 [Agreement] at 3.) The Agreement included a software development phase and a software licensing phase. In the software development phase, the parties would work together to determine Lincare's software needs and Apacheta would design and develop the software according to those needs. (Lincare's Stmt. of Undisputed Facts ¶¶ 18–20.) During this phase, Lincare would pay Apacheta a daily fee. (*Id.* ¶ 19; Agreement at 8–9.) After the software was completed and accepted by Lincare, the Agreement would move into the software licensing phase, in which Lincare would pay an annual software licensing and maintenance fee for the use and upkeep of the software. (*Id.*) The initial term of the Agreement was three years, although it would renew annually thereafter until Lincare notified Apacheta of its intent to terminate. (Agreement at 3.)

The Agreement included a "Statement of Work" (SOW), which outlined the framework for the software Apacheta agreed to produce. (Agreement at 13.) The SOW, in turn, contained a "Scope of Work" section, which provided a bulleted list of features to be included in the software, discussed further below. (*Id.*) The SOW also laid out the process by which Apacheta and Lincare were to work together to develop the software. (*Id.*)

The Agreement also contained a right-to-cure provision. The provision required, in part, that if one party breached the Agreement, the other party could terminate the Agreement only after giving the breaching party an opportunity to remedy the breach:

> If either Party breaches any term of this Agreement, the other Party may terminate this Agreement following thirty (30) days' written notice to the breaching Party specifying any such breach unless, within the period of such notice, all breaches specified therein are remedied.

(Agreement at 3.)

### B. The Course of the Relationship

The parties began work on the software development process in January 2015. (Lincare's Stmt. of Undisputed Facts ¶ 56.) While the Agreement did not establish fixed deadlines, the parties anticipated that the software would be completed within a year. (Apacheta's Br. in Supp. of Mot. for Summ. J. at 2.) However, the project fell behind schedule as Lincare dealt with leadership changes. (*Id.*) Lincare also began raising concerns about the software's specifications and ability to fulfill its needs. (Lincare's Stmt. of Undisputed Facts ¶¶ 68–85.) The parties discussed these concerns on multiple occasions. (*Id.*) Lincare was especially concerned with the proposed software's lack of certain features including "directory integration" and "route optimization" (the "Disputed Features"), which it claims were vital components of its desired software. (*See* Lincare's Stmt. of Disputed Facts ¶ 34.) Apacheta maintains that the Disputed Features were not required under the contract. (Apacheta's Br. in Opp'n to Lincare's Mot. for Summ. J. at 8.)

In October 2015, in an effort to keep the project moving forward, Apacheta sent Lincare a set of functional specifications that purported to lay out the final scope of the software. (Lincare's Stmt. of Undisputed Facts ¶ 87.) After some back and forth on the specifications, which did not include the Disputed Features, Apacheta also sent a set of proposed "acceptance criteria" that was required by the contract to be used to evaluate the software. (*Id.* ¶ 112.)

Still unsatisfied with the software, Lincare rejected the proposed acceptance criteria in an email on December 3, 2015. (*Id.* ¶ 135.) Lincare's email also reiterated its concerns about the absence of the Disputed Features in the proposed software. (*Id.*) Following this email, the project remained in limbo for several weeks. Finally, on February 1, 2016, Lincare terminated the Agreement. (Apacheta's Stmt. of Undisputed Facts ¶ 73.)

Apacheta then sued Lincare for breach of contract. Among other things, Apacheta claims that Lincare's termination breached the contract's right-to-cure provision, because Lincare did not provide Apacheta notice of a breach or an opportunity to cure any breach. Apacheta also seeks partial summary judgment as to damages in the amount of $2,250,000, based on the cost of the software licensing fee over a three-year period.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

Thereafter, the nonmoving party demonstrates a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000). The same standards apply when considering cross-motions for summary judgment. *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987).

## III. DISCUSSION

When interpreting a contract under Pennsylvania law[1], courts first determine whether the contract is clear or ambiguous. *Pac. Empl'rs Ins. Co. v. Glob. Reins. Corp. of Am.*, 693 F.3d 417, 426 (3d Cir. 2012). If the contract is clear, the court must apply its plain meaning. *Id.* However, if the contract is ambiguous, its meaning becomes a question of fact and may preclude summary judgment. *Id.* "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986). There are two kinds of ambiguity, patent and latent. *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 613 (3d Cir. 1995). A patent ambiguity is one that appears on the face of the instrument, whereas "a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous." *Id.* at 613–14.

In determining whether a contract is ambiguous, the court is not confined to the text of the contract, but should also consider "the context in which the agreement arose." *Steuart v. McChesney*, 444 A.2d 659, 662 (Pa. 1982). The court may consider extrinsic evidence such as "the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." *Teamsters Indus. Emps. Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993). An integration provision does not prevent the use of extrinsic evidence in the case of an ambiguity. *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1010 n.9 (3d Cir. 1980).

---

[1] The Agreement contains a choice of law clause selecting Pennsylvania law. (Agreement at 7.)

Here, ambiguities in the contract preclude summary judgment. The contract is unclear as to whether Apacheta was required to provide the Disputed Features. It is also unclear what damages Apacheta would be entitled to if Lincare did, in fact, breach the contract.

A. **The Right-to-Cure Provision and Apacheta's Contractual Obligations**

As noted above, the contract contains a right-to-cure provision, which Apacheta claims Lincare breached by terminating the contract without providing Apacheta notice of a breach and thirty days to cure any alleged breach. Pennsylvania law allows a party to ignore a right-to-cure provision only if "there is a material breach of the contract so serious it goes directly to the heart and essence of the contract, rendering the breach incurable." *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 641 (Pa. 2009). In *LJL Transportation*, the court found that pre-termination notice would have been "a useless gesture" because the breach could "not reasonably be cured," and therefore held that such notice was not required. *Id.* at 652. Here, because of ambiguities in the contract, there are factual questions as to whether there was a breach that might allow Lincare to similarly ignore the right-to-cure provision.

Lincare argues that it was entitled to ignore the right-to-cure provision because Apacheta failed to satisfy the "heart and essence of the Agreement," in that it was unable to provide the Disputed Features in the software, which were essential to Lincare's anticipated digital delivery management system. (Lincare's Br. in Supp. of Mot. for Summ. J. at 23.) According to Lincare, Apacheta's "admi[ssion] that it did not have the capability to integrate with Lincare's Active Directory" made it clear that it would not be able to cure the breach. (Lincare's Br. in Opp'n to Apacheta's Mot. for Summ. J. at 19.) Thus, pre-termination notice would have been a "useless gesture." *LJL Transp.*, 962 A.2d at 652.

In response, Apacheta claims that the Agreement did not require the Disputed Features. (Apacheta's Br. in Opp'n to Lincare's Mot. for Summ. J. at 8.) It notes that the Scope of Work section of the contract does not include any reference to such features. It also points to depositions of its employees that suggest those employees did not interpret the contract to require these features as part of the software.

However, Lincare expresses a different understanding of the contract, one in which the software's "technical aspects" were to be worked out during the course of the software development phase. (Lincare's Stmt. of Disputed Facts ¶ 5.) Lincare suggests that the Agreement was analogous to a "design and build" contract, in which the written agreement provides an overarching framework for the project, with the details to be filled in by the parties as the project progresses. (Lincare's Br. in Supp. of Mot. for Summ. J. at 20–21 (citing *Armour & Co. v. Scott*, 360 F. Supp. 319 (W.D. Pa. 1972)).) Thus, according to Lincare, even though the Disputed Features were not specified in the text of the contract, they were nevertheless details of the software that the parties expected to fill in. Indeed, Lincare argues that these details were vital technical aspects of its proposed delivery management software—the "heart and essence" of the contract.

The Agreement itself provides little in the way of details regarding the software's components. The Scope of Work section gives only a bulleted list of general software features, such as "Trip/Stop management including dynamic updates," "Pick-up, delivery, and exchange workflow," and "Dispatch and assignment of orders." (Agreement at 13.) The Disputed Features do not appear in this list. However, because the contract does not define or elaborate on the features that *are* in the list, it is unclear whether the Disputed Features were not included because

they were not intended to be a part of the product or whether they were, as Lincare argues, details that fell under the broad features in the list.

When considered alongside the text of the Agreement, the extrinsic evidence establishes that the Agreement is ambiguous with regard to the presence of the Disputed Features in the software. For instance, the depositions from key employees at each company display divergent understandings of the contract. At her deposition, Cora Forgeng, Apacheta's Project Manager, addressed the fact that one of the Disputed Features—directory integration—was not listed among the features in the Scope of Work. According to Forgeng, "[a]ctive directory is wholly outside the scope of this. It definitely is a separate project." (Lincare's Mot. for Summ. J. Ex. D [Forgeng Dep.] at 24.) However, Linda Reid, Lincare's Head of Application Technology, expressed an understanding in her deposition that the Disputed Features *did*, in fact, fall within the scope of the items listed in the Scope of Work. (Lincare's Mot. for Summ. J. Ex. A [Reid Dep.] at 40.) Reid suggested that the features listed in the Scope of Work "are high-level groups," and that, for instance, route optimization "falls into a lot of those areas." (*Id.*)

The parties' conduct during the course of the relationship also suggests that the Agreement is ambiguous. On one hand, Lincare notes that its employees had a number of discussions with Apacheta's staff regarding the directory integration and route optimization features. (Lincare's Br. in Supp. of Mot. for Summ. J. at 21.) For instance, Lincare representatives discussed their concerns about directory integration at a meeting with Apacheta representatives in July 2015. (Lincare's Stmt. of Undisputed Facts ¶ 71.) Apacheta's CEO, Gregg Timmons, said of the discussions that "there wasn't anything that was horribly out of scope that I saw." (Lincare's Mot. for Summ. J. Ex. B [Timmons Dep.] at 35.) Timmons went on to say that "[t]here may have been some items that . . . eventually . . . manifested themselves [as]

being out of scope and we had to create a [project change request] on." (*Id.*) This suggests there was some gray area as to which features fell inside or outside the scope of the project.

On the other hand, Apacheta points to an email from Cora Forgeng to Lincare employees explaining that Lincare was required to submit a "project change request"[2] to expand the scope of the Agreement if it wanted to include the directory integration feature in the software, again raising the possibility that the Disputed Features were not included in the Agreement. (Apacheta's Br. in Opp'n to Lincare's Mot. for Summ. J. at 8; Forgeng Dep. at 24.)

Taken together, the contract's lack of definition of the software components and the extrinsic evidence indicate that the contract is ambiguous as to whether Apacheta was required to provide the Disputed Features. Thus, the Court must deny both summary judgment motions. *See Pac. Empl'rs*, 693 F.3d at 426 (noting that ambiguous contracts are interpreted by the factfinder). A factual determination as to whether the Disputed Features were a part of the contract is necessary for the Court's evaluation of Lincare's argument that Apacheta committed a breach sufficient to waive the right-to-cure provision.

### B. Damages

Even if Apacheta could show that Lincare breached the Agreement as a matter of law, there are ambiguities in the contract that would preclude summary judgment as to damages. The contract provides for an annual software licensing fee of $750,000. (Agreement at 8.) However, the contract is unclear as to when the full software licensing fee becomes due and how much the fee is.

---

[2] The Agreement provides as follows: "Any change of scope will be identified and mutually agreed upon in writing by the Parties (a "Project Change Request"). Upon execution of a Project Change Request by both Parties, such Project Change Request shall become a constituent part of the applicable SOW."

First, the contract does not establish a deadline for completion of the software and Lincare's acceptance of it. Thus, given the significant delays the project faced, there are factual questions as to when in the contract's three year life the software would have been completed and the software licensing fee triggered.

Second, the contract is patently ambiguous as to the amount due in licensing fees in the first year of acceptance. The contract provides for a prorated licensing fee during the first year of acceptance, presumably because the parties anticipated that Apacheta would present a completed software program to Lincare within a year of the contract's signing. The contract provides that $250,000 would be due on the date of Lincare's acceptance of the software. In addition, two subsequent payments of "$TBD" were to be due on certain other dates, with the amounts of such payments "[p]rorated from Acceptance Date." (Agreement at 9.) These terms are ambiguous because nothing in the contract explains how the payment amounts were to be determined. Thus, even if the Court were to find Lincare liable for breach of contract, factual questions would remain as to damages.

## IV.   CONCLUSION

Because there are genuine issues of material fact in the case as to both Lincare's potential liability and damages, the cross-motions for summary judgment are denied. An Order consistent with this Memorandum will be docketed separately.