**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| APACHETA CORPORATION, | : | |
| A CALIFORNIA CORPORATION | : | No. 2:16-cv-02030-BMS |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LINCARE, INC., | : | |
| A DELAWARE CORPORATION | : | |
| | : | |
| Defendant. | : | |
| | : | |

**APACHETA'S PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff, Apacheta Corporation ("Apacheta"), by and through its attorneys and pursuant

to this Court's March 22, 2017 Order (D.E. 23 ¶ 9), hereby submits the following Proposed

Findings of Fact and Conclusions of Law with respect to its breach of contract claim filed against

Defendant Lincare, Inc. ("Lincare") on April 27, 2016.

## I.     FINDINGS OF FACT

### A.     The Parties

1.     Apacheta provides mobile software applications used in the transportation and

delivery of goods.  (Complaint ¶ 7; Answer ¶ 7.)

2.     Lincare supplies and delivers home medical equipment.  (*See* Dep. of L. Reid at

39:13-15.)

### B. The Parties Negotiated and Executed a Software License and Services Agreement

3.  On December 15, 2014, Lincare and Apacheta entered into a written "Software License and Services Agreement" (the "Agreement"). (Trial Ex. 2, Agreement; Dep. of L. Reid at 16:14-18.)

4.  Gary Wolsiefer, Lincare's Director of Information Technology, as expressly authorized by Shawn Schabel, Lincare's COO, executed the Agreement on behalf of Lincare. (Agreement, at 7, 16; Dep. of G. Wolsiefer at 12:6-16; Dep. of L. Reid at 17:6-9; 17:17-19.)

5.  Both Messrs. Wolsiefer and Schabel, as Lincare's Director of IT and Lincare's COO, respectively, reviewed the technical aspects of the Agreement before signing. (Dep. of G. Wolsiefer at 18:3-9.)

6.  Lincare's internal legal counsel also reviewed the Agreement and its terms prior to execution. (Dep. of G. Wolsiefer at 16:15-18.)

### C. Project Background and Pre-Contractual Demonstrations

7.  Lincare's interest in an Apacheta software solution arose after Mr. Schabel, Lincare's COO, instructed Mr. Wolsiefer to investigate the Apacheta software in April 2014. (Dep. of G. Wolsiefer at 12:17-24, 14:5-7; Dep. of L. Reid at 25:8-19; Trial Ex. 32, Email from J. Wee to G. Wolsiefer dated Apr. 8, 2014.)

8.  As part of Mr. Wolsiefer's research, James Wee, Vice President of Business Development at Apacheta, sent Mr. Wolsiefer a "white paper" on April 8, 2014 describing the Apacheta software. (Trial Ex. 93, "Delivering Superior Patient Care Using Mobility Solutions for HME/DME;" Dep. of G. Wolsiefer at 13:11-14:6; Dep. of J. Wee at 81:9-83:9.)

9.  As confirmed by Mr. Wolsiefer and Mr. Hermes, representatives from Apacheta visited Lincare's offices in Tampa, Florida at least twice in 2014 prior to the Agreement's

execution for meetings and demonstrations of the basic functionality of the Apacheta software application. (Dep. of G. Wolsiefer at 15:12-16:4; Dep. of K. Hermes at 10:1-16.) These demonstrations were given using a "live nonproduction system." (Dep. of J. Wee at 152:24-153:7.)

10. Among other things, these pre-contractual demonstrations included discussions between Lincare and Apacheta about route optimization, and Apacheta showcased the software's ability in this regard by demonstrating how the software could visualize stops on a map, which would allow a dispatcher to manually create routes and sequence the order of stops along a delivery route. (Dep. of J. Wee at 143:8-155:23.)

11. According to Mr. Wolsiefer, Lincare was satisfied that the functionality of Apacheta's software would be able to meet Lincare's needs. (Dep. of G. Wolsiefer at 16:5-8; Dep. of K. Hermes at 11:5-8.) At no point pre-contractually did Lincare express that the level of route optimization offered by the Apacheta software would be insufficient for Lincare's needs. (Dep. of J. Wee at 157:2-10.)

12. Satisfied that the Apacheta software would meet Lincare's needs, Lincare began contract negotiations with Apacheta in the summer of 2015. (*See, e.g.*, Dep. of J. Wee at 83:22-84:6.)

     **D.**    **The Agreement**

        **1.**    *Applicable law, term, and payment*

13. The Agreement contains a Pennsylvania choice of law provision. (Agreement at 7, § 9.12.)

14. The Agreement was for an initial three-year term, commencing on the Effective Date of December 15, 2014:

**5.1 Term**. Unless otherwise indicated in Exhibit A, the term of this Agreement begins on the Effective Date and continues for a period of three (3) years thereafter, unless terminated sooner in accordance herewith (the "Initial Term"). Thereafter, this Agreement will renew for additional one year terms (each a "Renewal Term", and collectively with the Initial Term the "Term") unless Customer provides written notice to Apacheta of its intent to terminate this Agreement at least ninety (90) days' prior to the state of any Renewal Term.

(Agreement at 3, §§ 5.1, 5.2; *see also* Dep. of G. Wolsiefer at 28:6-11; 31:9-16.)

15. Mr. Wolsiefer—Lincare's Director of IT, the project's IT sponsor, and the authorized signer of the Agreement on behalf of Lincare—anticipated that Lincare would "use the [software] until it didn't meet [Lincare's] needs anymore, if that was the case." (Dep. of G. Wolsiefer at 30:21-31:6; Dep. of L. Reid at 25:8-19.)

16. The Agreement provided for an annual $750,000 licensing and maintenance fee, which fee Lincare had negotiated down from a proposed higher rate of $900,000. (Agreement, at 8; Trial Ex. 7, Email from G. Wolsiefer to J. Wee dated Nov. 7, 2014 (Mr. Wolsiefer writing to Apacheta: "[Mr. Schabel's] take is that we need to be at more like 750k per year for licensing to make this work."); Dep. of L. Reid at 51:18-52:10; Dep. of G. Wolsiefer at 19:7-20:8.)

17. Mr. Wolsiefer understood that the first year's payment of $750,000 would be prorated, followed by fees of $750,000 in both years two and three. (Dep. of G. Wolsiefer at 30:21-31:6.)

18. Shortly after the Agreement was executed, Apacheta's internal accounting business records reflected that Apacheta expected the value of the Agreement during its initial three-year term to be $2,340,000, comprised of $90,000 in professional service fees and three annual software license and maintenance fee payments of $750,000 each. (*See* Trial Exs. 112, 113.)

19.     Lincare paid Apacheta $52,500 in connection with the Agreement, which amount was solely for professional services.  Lincare has paid no portion of any of the annual license and maintenance fees.  (Dep. of G. Timmons at 195:12-16, 271:7-13; Dep. of L. Reid at 253:2-4.)

### 2.     *Review and acceptance of deliverables*

20.     The Agreement specifies the services Lincare contracted Apacheta to provide and the manner in which Lincare would review and approve these services, which were specified as project Deliverables.  (Agreement at 3, § 4.1 (defining Statement of Work).)

21.     All such Deliverables were set forth in the Agreement's Statement of Work, which is Exhibit C to the Agreement.  (Agreement at 13-16; Dep. of L. Reid at 57:8-14.)

22.     In the Agreement, Apacheta agreed that it would "supply Software and Services to automate [Lincare's] HME/DME field technician operations . . . which includes connectivity to [Lincare's] host system."

23.     In the Agreement, Lincare represented that it "shall perform" certain "Customer Responsibilities" "in a timely and businesslike manner."

24.     Lincare's express Customer Responsibilities included the following:

- "[Lincare] shall work with Apacheta to develop Acceptance Criteria documents" which were required to "include test plans, use cases, test data, test scripts, test environment and other items as needed to provide clear benchmarks for accepting each Deliverable."

- "providing all required approvals/failure notices in a timely manner;" and

- "participating in progress and deliverable reviews."

25.     The Agreement sets forth a bulleted list of "base functionalities" that would be included in the software, including: "Pre-trip inspection;" "Load management;" "Trip stop

management, including dynamic updates from Transport Manager;" "Pick-up, delivery, and exchange workflow including exception management;" "Real-Time Delivery status and timestamps;" "Customer stop detail;" "Barcode scanning;" "Proof of delivery/Signature capture;" "Dispatch – driver messaging;" "Electronic forms;" "Remote Mobile Device Management;" "Dispatch and assignment of orders to TransportACE;" "Monitor order status;" "Map views of locations (customer, depot, and vehicles);" and "Reports."

26.     The parties agreed to the manner in which Deliverables would be accepted by Lincare, including that Deliverables that were not rejected would be deemed accepted 15 days after delivery:

> **4.3 Acceptance of Deliverables.**  Each SOW will describe, if applicable, the deliverables that Apacheta is obligated to furnish to Customer hereunder (collectively, the "Deliverables") and the acceptance criteria for each of the Deliverables, if applicable (the "Acceptance Criteria").  Unless set forth otherwise in a SOW, each Deliverable shall be deemed accepted fifteen (15) days after delivery by Apacheta to Customer (the "Acceptance Date.").

(Agreement at 3, §4.3).

27.     Lincare's Federal Rule of Civil Procedure 30(b)(6) designee, Linda Reid, admits that the language contained in the Acceptance and Deliverables section of the Agreement is clear.  (Dep. of L. Reid at 65:16-67:6 ("Q.  And that's pretty easy to understand.  You would agree that if Lincare received the deliverable and didn't reject that deliverable within 15 after receipt, it would beed accepted, right?  A.  Yes.  I don't agree with contracts being written this way, but I understand that this was written this way.").)

28.     Moreover, the parties agreed that "[i]n the event that Customer [Lincare] rejects a Deliverable (i) Customer will set forth in writing and in reasonable detail, the reason for the rejection and (ii) Apacheta shall use commercially reasonable efforts to correct such Deliverable in a timely manner."  (Agreement at 15, § 2.3.)

### 3. *Project Phases*

29.     Under the terms of the Agreement, the project would be completed in five phases:

      (a)     Phase I – Project Inception Phase
      (b)     Phase II – Configuration and Development Phase
      (c)     Phase III – Acceptance Test Phase
      (d)     Phase IV – Rollout Support
      (e)     Phase V – Project Management

30.     The Project Inception Phase (Phase I) was billed and paid on a "time and materials basis" whereby Lincare would compensate Apacheta at the rate of $1,500 per day, or $187.50 per hour, for the work performed by Apacheta.

31.     The Project Inception Phase (Phase I) included six subparts:

      (a)     Kick-Off Meeting
      (b)     Review of application functionality and integration
      (c)     Finalize any custom development requirements
      (d)     Acceptance Criteria
      (e)     Project Plan
      (f)     Final SOW Acceptance

32.     It was understood by both Apacheta and Lincare that there would be certain customizations that needed to be made to Apacheta's base software to meet Lincare's business needs, and that these customizations would be documented in a series of functional specification documents during the Project Inception Phase (Phase I(c)).

33.     With regard to the "Acceptance Criteria" (Phase I(d)), Lincare represented that it "shall work with Apacheta to develop the Acceptance Criteria documents" which "shall be mutually agreed and signed off upon by Apacheta and [Lincare] prior to implementation" and "shall include test plans, use cases, test data, test scripts, test environment and other items as needed to provide clear benchmarks for accepting each Deliverable."

34.     Lincare expressly agreed that its acceptance of the Final SOW (Phase I(f)), which triggered the events mentioned above, could not be "unreasonably withheld."

35.     Upon completion of the Project Inception Phase, three events would occur: (a) the balance of any fees for professional services provided by Apacheta to Lincare would become due; (b) an initial $250,000 payment towards the first annual $750,000 software license fee would become due, with remaining $500,000 of that payment to be prorated; and (c) the Project would enter the next phase, the Configuration and Development Phase.

36.     The Agreement does not establish a deadline for the completion of any particular tasks or Deliverables, but the Agreement reflects the parties' understanding that the Project Inception Phase and Acceptance Date would be completed within 12 months of the December 15, 2014 Effective Date of the Agreement, or by December 15, 2015.  (Agreement at 9, § 2.1.)

### 4.     *Termination and notice*

37.     The Agreement contains conditions precedent to termination:

**5. Term and Termination**

**\*\*\***

**5.2 Termination on Breach**. If either Party breaches any term of this Agreement, the other Party may terminate this Agreement following thirty (30) days' written notice to the breaching Party specifying any such breach unless, within the period of such a notice, all breaches specified therein are remedied.  If the breach is one which, by its nature, cannot be fully remedied in thirty (30) days, the Parties shall cooperate to prepare a mutually acceptable plan to cure the breach within such thirty (30) day period and then pursuant to which, the breaching Party shall undertake reasonable, diligent and good faith efforts to promptly remedy the breach.  If the Parties are unable to agree upon a plan to remedy the breach within such thirty (30) day period, the non-breaching Party may terminate this Agreement.  If, after the Parties have agreed upon a remedial plan, the breaching Party fails to comply with such plan, the non-breaching Party may thereafter terminate this Agreement effective on written notice.

(*Id.* at 3, §§ 5.1, 5.2.)

38.     With regard to notices, the Agreement provides:

**9.2 Notices**. Any notice required or permitted under the terms of this Agreement or required by law must be made in writing and must be (a) delivered in person, (b) sent by first class registered mail, or air mail, as appropriate, or (c) sent by

overnight air courier, in each case properly posted and fully prepaid to the appropriate address set forth below.

(*Id*. at 6, § 9.2.)

39.     As the Agreement was being negotiated, the parties (through their respective legal counsel at the time) specifically discussed and reviewed the Agreement's termination provision prior to execution.  (*See* Dep. Ex. 8; Dep. of L. Reid at 54:22-55:3; Dep. of G. Wolsiefer at 21:11-18; 25:3-8; 25:16-26:1; 33:10-25.)

40.     The Agreement's termination provision is clear and unambiguous, and Lincare admits through its 30(b)(6) witness that the section of the contract titled "termination and breach" is clear and not confusing.  (Dep. of L. Reid at 145:12-146:22.)

41.     Mr. Wolsiefer also agrees that Section 5.2 is "very clear and understandable . . ." and means "in layman's terms . . . that if either party breaches the agreement, that the other party can terminate the agreement with a 30-days written notice, and that the breaching party has 30 days within that notice to remedy the breach."  (Dep. of G. Wolsiefer at 32:19-21; 35:11-19.)

**E.     The Project**

42.     The project began in January 2015 by way of a kickoff meeting.  The kickoff meeting was intended to introduce the teams and assign project managers and was the first step in starting the project's inception phase under the Agreement.  (Dep. of G. Wolsiefer at 36:11-24; Dep. of L. Reid at 70:7-71:5.)

43.     The next step after the kickoff meeting was to develop a statement of work, which would be a written document in the form of functional specifications.  Part of the process of developing this document was understanding what, if any, customization requirements Lincare would have for Apacheta's software.  That process was to then be followed by development, beta testing, and deployment of the software.  (Dep. of K. Hermes at 13:24-15:24.)

44.    On January 22, 2015, Cora Forgeng, Apacheta's project manager, sent Lincare a sample set of acceptance plans.  (Trial Ex. 10.)

45.    On at least two occasions, including on June 8, 2015, Apacheta provided additional demonstrations of its software to Lincare.  (Trial Ex. 121, Recording of Live Demonstration, dated June 8, 2015 (referencing prior demonstrations).)

46.    During the project's initial phase, the parties worked on developing three sets of functional specifications, and these specifications went through multiple versions and iterations. (*See, e.g.*, Dep. of R. Batezel at 23:17-22.)

47.    The functional specifications were intended to define "all functionality of the system" and, once approved, Apacheta would base all coding work needed to build Lincare's custom development needs on these documents.  (Dep. of G. Wolsiefer at 49:8-50:19; Dep. of B. Marshall at 16:1-6, 17:20-18:2, 31:16-32:1.)

48.    On July 14, 2015, Cora Forgeng, Apacheta's Project Manager, sent initial drafts of the three sets of functional specifications (TransportACE functional specifications; TransportManager functional specifications; and an Integration Specification) to Lincare.  (Trial Ex. 123, Email from C. Forgeng to K. Hermes, et al.)

49.    On July 14 and 15, 2015, Lincare hosted a two-day "Mobile Fulfillment Project Peer Review" meeting in Tampa, Florida which was attended by Gregg Timmons (Apacheta's CEO), Ms. Forgeng, and Mike Kabat (Apacheta's Vice President of Engineering), along with a number of Lincare representatives, including Greg McCarthy (Lincare's COO), Messrs. Wolsifer and Hermes, and other Lincare employees.

50.    As a result of this two-day meeting, Apacheta further worked to develop and revise the functional specification documents.

51.     On July 24, 2015, Lincare's new CEO (Ms. Hoefer) issued a company-wide report about the project between Lincare and Apacheta, reporting that the project was ongoing, with expected roll-out in mid-2016.  In her July 24, 2015 report, Ms. Hoefer did not identify any issues or deficiencies surrounding the project.  (Trial Ex. 12; Dep. of L. Reid, at 97:19-98:15.)

52.     As of July 30, 2015, the project was three to four months behind the proposed project timeline, and Mr. Wolsiefer, Lincare's Director of IT at the time, admits that Lincare was the sole cause of this delay.

53.     On July 30, 2015, Mr. Wolsiefer proposed internally at Lincare that Lincare should pay Apacheta an additional fee because of the delay.  He also acknowledged at the time that Apacheta had "been a good partner" thus far.  (Trial Ex. 13, Email from G. Wolsiefer to K. Hermes dated July 30, 2015; Dep. of G. Wolsiefer at 42:8-45:1.)

54.     Other key Lincare employees, including Kent Hermes, Lincare's Manager of IT Development (who was second-in-command under Mr. Wolsiefer and who was considered Lincare's "lead on the project"), agreed with Mr. Wolsiefer's assessment that Lincare had solely been responsible for delays and that Apacheta had acted as a good partner.  (*See, e.g.*, Trial Ex. 11, Email from K. Hermes to G. McCarthy dated Aug. 31, 2015 (writing that Apacheta had "been excellent to work with in spite of our delays."); Dep. of K. Hermes at 21:22-24; 28:8-9, 34:5-9; Dep. of B. Marshall at 10:22-11:2 (agreeing that Hermes was "lead"); Dep. of R. Batezel at 13:7-11 (same).)

55.     On July 31, 2015, Mr. Wolsiefer retired as Lincare's Director of IT, which he has explained was due, at least in part, to Lincare's hiring of a new CEO and the fact that Lincare appeared to be heading in a "new direction."  (Trial Ex. 12, Email from K. Hoefer to

"Colleagues" dated July 24, 2015; Dep. of G. Wolsiefer at 8:18-9:19; Dep. of L. Reid at 18:24-19:1, 37:8-11, 95:10-12; *see also* Dep. of G. McCarthy at 9:9-10:23.)

56.     At the time he left Lincare at the end of July 2015, Mr. Wolsiefer had no reason to believe that Apacheta could not deliver or was not willing to deliver an acceptable solution to Lincare. (Dep. of G. Wolsiefer at 45:2-14.) Nor did he have any reason to think Apacheta would be terminated from the project, nor had he ever heard anyone make such recommendations internally at Lincare. (*Id.* at 51:24-52:21.)

57.     On August 4, 2015, Ms. Forgeng sent revised drafts of the three sets of functional specifications to Lincare. (Trial Ex. 124, Email from C. Forgeng to B. Marshall.)

58.     According to Barnes Marshall, Lincare's Senior Software Developer at the time and one of the Lincare employees charged with reviewing these documents, these functional specifications (and subsequent versions thereof) were the result of a collaborative effort between the parties. (Dep. of B. Marshall at 29:17-32:1.)

59.     Mr. Marshall confirms that the purpose of these functional specification documents was to "lay out the scope" of the project and would form the basis of the next phase of the project, during which Apacheta would configure and develop the software. (*Id.*; Trial Ex. 14.)

60.     On August 28, 2015 Mr. Marshall advised Ms. Forgeng that he was "trying to schedule an aggressive review on our side for final sign-off" and asked whether Ms. Forgeng could send back revised specifications prior to September 11, 2015. (Trial Ex. 14.)

61.     On September 4, 2015, Ms. Forgeng sent revised drafts of the Transport Manager and TransportACE functional specifications to Lincare. (Trial Exs. 125, 138.)

62.     On September 9, 2015, Ms. Forgeng sent a further revised draft of the TransportACE functional specifications to Lincare.  (Trial Ex. 126, Email from C. Forgeng to B. Marshall, et al.)

63.     During the first week of September 2015, Mr. Hermes, who had been Lincare's "lead on the project, took a leave of absence.  Mr. Hermes ultimately did not return to work on the project because he was terminated by Lincare at the end of September 2015.  (Dep. of K. Hermes at 5:18-6:14.)

64.     At the time he left Lincare, Mr. Hermes continued to believe that Apacheta was a good partner.  He had never had any complaints about the quality of Apacheta's work, and he believed that Apacheta was fully performing under the Agreement.  (Dep. of K. Hermes at 15:25-19:24; 29:10-30:8.)  And as with Mr. Wolsiefer, no one at Lincare had ever expressed to Mr. Hermes that Apacheta had violated or been in breach of the Agreement.  (Dep. of K. Hermes at 38:24-39:14.)  Mr. Hermes was surprised to learn later that the project had been terminated by Lincare.  (Dep. of K. Hermes at 15:25-19:24.)

65.     As a result of the departures of Messrs. Wolsiefer and Hermes, Robert Batezel, whose title was IBMI Development Manager at Lincare and who had previously reported to Mr. Hermes, became the project leader and main point of contact at Lincare for the project.  (Dep. of R. Batezel at 13:2-14:10.)

66.     On September 24, 2015, Mr. McCarthy, Lincare's COO, asked Lincare's internal project team for "a brief update on where we stand on [the project] and the next milestone[.]"  In response, Mr. Batezel, who at the time was leading the project for Lincare, reported to Mr. McCarthy that Lincare was "currently finalizing the specification with Apacheta," by which he meant the functional specifications, and that Lincare "expect[ed] to have that wrapped up by next

week." Mr. Batezel further reported that after the functional specifications were finalized, Lincare would "give Apacheta the OK to move forward with making our custom changes to their applications." Mr. Batezel did not suggest or identify for Mr. McCarthy any alleged problems or deficiencies with Apacheta's software or the project at the time. (Trial Ex. 15; Dep. of L. Reid at 114:19-24; Dep. of R. Batezel at 19:5-23.)

67. As a result of further collaborative efforts between the parties, on September 29, 2015, Ms. Forgeng sent revised drafts of the three sets of functional specifications to Lincare. (Trial Ex. 127, Email from C. Forgeng to B. Marshall, et al.)

68. In late September 2015 (after Messrs. Wolsiefer and Hermes had left Lincare), a live demonstration was held to review the software. Mr. Batezel and Mr. Marshall both attended the demonstration, and Mr. Batezel reported internally to Mr. McCarthy, Lincare's COO, that "[t]he demo was well received by the operations team." (Trial Ex. 15, Email from R. Batezel to G. McCarthy dated Sept. 24, 2015; Dep. of L. Reid at 112:19-114:18.)

69. According to Mr. Marshall, the late September 2015 live demonstration of the software was only possible "because the scope of the project had been well-defined that . . . this is the work that will be done from an IT perspective, from a technical perspective, and . . . at this point there would be no major missing gaps . . . as far as major functionality goes." (Dep. of B. Marshall at 21:23-22:4; 22:16-23:4.)

70. On October 1, 2015, Linda Reid joined Lincare and assumed the new role of Head of Application Technology. As part of her role, she took over some of Mr. Wolsiefer's prior responsibilities as Director of IT. (Dep. of L. Reid at 18:24-19:1, 37:12-17, 95:10-12, 116:11-14; *see also* Dep. of G. McCarthy at 13:12-18; Dep. of R. Batezel at 20:23-21:1.)

71.     Within two day of arriving at Lincare, and without having any communication with Apacheta, Ms. Reid requested information from the Lincare project team about the termination provisions of the Agreement.  Ms. Reid was informed that "[t]he termination clause is 30 days written notice, but the termination events are limited."  (Trial Ex 16, Email from M. Moore to L. Reid, dated Oct. 3, 2015; Dep. of L. Reid at 132:24-134.))

72.     Within one week of Ms. Reid's arrival, and again without having had any communication with Apacheta, Ms. Reid told Lincare's COO that she "was not a big supporter of Apacheta" based on her purported "previous experience" and that Lincare "should look at other options."  (Dep. of G. McCarthy at 17:5-18:20.)

**F.    Apacheta Delivers Final Functional Specifications**

73.     On October 5, 2015, Ms. Forgeng of Apacheta delivered three sets of functional specifications to Lincare (the "October 5, 2015 Deliverable").  The transmittal email's subject line read:  "Updated Functional Specs for your review and approval."  (Trial Ex. 19; Dep. of L. Reid at 85:16-25.)

74.     Prior to October 5, 2015, the parties had jointly revised six versions of the TransportACE functional specifications, three versions of the TransportManager functional specifications, and four versions of the Integration Specification.  (Trial Ex. 19.)

75.     When Ms. Forgeng delivered the October 5, 2015 Deliverable, she believed them to be in final form, subject only to minor revision of the variety that is standard during software projects.  (Dep. of C. Forgeng at 136:9-137:9.)

76.     At the time the October 5, 2015 Deliverable was sent to Lincare, Ms. Forgeng believed that Apacheta was ready and able to fully deliver the software solution to Lincare based on these specifications.

77.     Over the course of the project, up to and including the date of delivery of the October 5, 2015 Deliverable, no one at Lincare had ever communicated to Ms. Forgeng that Lincare believed the Apacheta software was incompatible in any manner with Lincare's business.  (Dep. of C. Forgeng at 186:21-187:8.)

78.     According to Mr. Batezel, who had been leading the project at Lincare since the departure of Mr. Hermes at the end of September 2015, the plan internally at Lincare was to review the October 5, 2015 Deliverable to make sure that "the changes that Apacheta is going to make to their side are going to interface properly to our side."  (Dep. of R. Batezel at 23:3-11.)

79.     Lincare was aware that Apacheta believed the October 5, 2015 Deliverable to be final and that Apacheta was requesting that Lincare review and approve this Deliverable.  (Dep. of L. Reid at 223:16-20; *see also* Trial Ex. 52, Email from C. Forgeng to R. Batezel et al. dated Oct. 9, 2015 (noting under the heading "10/9/15 Lincare – Weekly Status Meeting Notes" that "[o]n Tuesday, 10/5/15, final functional specifications were sent for Lincare approval").)

80.     Lincare agrees that it was contractually obligated to review and either approve or reject the October 5, 2015 Deliverable.  (Dep. of L. Reid at 179:14-17; 185:8-13.)

81.     Lincare confirms that it was in a position to review the October 5, 2015 Deliverable at the time it was delivered, and in fact, that Lincare did begin that review.  (Dep. of L. Reid at 91:16-23.)

82.     At some point in October 2015, Ms. Reid told the Lincare team to cease all work on the project.  (Dep. of R. Batezel at 27:7-17; Dep. of B. Marshall at 34:7-35:19, 39:16-22.)

83.     But no one at Lincare told Apacheta of this work stoppage.  Indeed, even as late as December 4, 2015, no such word had been passed to Apacheta.  (Dep. of B. Marshall at 34:7-35:19, 39:16-22.)

84.     Instead, Lincare informed Apacheta during an October 9, 2015 Weekly Status Meeting (and then continued to report the same for several weeks thereafter), that it was reviewing the October 5, 2015 Deliverable.  (Trial Ex. 20, Email chain from C. Forgeng to R. Batezel et al. containing "Weekly Status Meeting Notes" for the period Oct. 9, 2015 through Dec. 11, 2015; Dep. of L. Reid at 223:21-23; *see also* Dep. of B. Marshall at 29:4-16 (confirming the accuracy of the Weekly Status Meeting Notes).)

85.     This pattern continued for weeks, with Lincare taking no action to reject the October 5, 2015 Deliverable or to notify Apacheta that the Deliverable was deficient or insufficient in any manner.  (Dep. of L. Reid at 175:1-6.)

86.     As of October 20, 2015, fifteen (15) days following Apacheta's delivery to Lincare of the October 5, 2015 Deliverable, Lincare had not taken any action to reject the Deliverable, whether by providing Apacheta with written notice of rejection (as required by the Agreement) or otherwise.  (Dep. of L. Reid at 172:5-16.)

87.     Then, on November 16, 2015, Lincare's executive management informed Apacheta by email that Lincare's executive team had "not yet reviewed" the October 5, 2015 Deliverable.  Like Lincare's other communications on the subject, this email did not identify any deficiencies or gaps in the October 5, 2015 Deliverable or indicate that Lincare was intending either to reject this Deliverable or terminate the project.  (Trial Ex. 22, Email from G. McCarthy to G. Timmons dated Nov. 16, 2015; Dep. of L. Reid at 188:18-189:3; Dep. of G. McCarthy at 22:4-23:13.)

88.     As part of the Lincare's express "Customer Responsibilities," the Agreement provided that during the Project Inception Phase, "[Lincare] shall work with Apacheta to develop the Acceptance Criteria documents."  (Agreement, p. 15, § 3.2.)  Although Ms. Forgeng had

forwarded sample acceptance documents to Lincare shortly after the initial project kick-off meeting in January 2015, at no point had Lincare taken any action to develop such documents, despite its requirement to do so.

89.     Apacheta took it upon itself to develop a draft of these documents, and on November 20, 2015, Ms. Forgeng sent Lincare proposed Acceptance Criteria and a Project Plan. (Trial Ex. 25.)

90.     Rather than "work with Apacheta to develop the Acceptance Criteria documents," Lincare's response was to purportedly reject these documents.  To that end, on December 3, 2015, Linda Reid from Lincare sent Cora Forgeng from Apacheta an email with the subject: "Not Accepted – Apacheta Acceptance Criteria – Lincare Implementation & Project Plan."  Ms. Reid's December 3, 2015 email indicated that the proposed Acceptance Criteria and Project Plan were "Not Accepted" because, according to Ms. Reid, they did not comply with "aspects of the product previously identified, e.g. patient portal, directory integration, single sign-on, dynamic electronic forms mapping, inventory and tracking, scalability, route optimization."

91.     Ms. Reid's December 3, 2015 email did not, however, indicate that Lincare believed Apacheta was in breach of the parties' Agreement, nor did it suggest that Lincare was intending to terminate the Project or the Agreement.

92.     Lincare has contended in this litigation that Ms. Reid's December 3, 2015 email constituted proper notice to Apacheta under Section 5.2 of the Agreement.  Ms. Reid, however, admitted in her deposition as Lincare's Rule 30(b)(6) designee that at no point during the project did Lincare ever inform Apacheta, either orally or in writing, that Apacheta was in breach of the Agreement.  (Dep. of L. Reid at 146:23-147:20.)

93.     In her email of December 3, 2014, Ms. Reid alleged that certain individual "aspects of the product" were missing from the Apacheta software, and Lincare has contended in this litigation that these allegedly missing "aspects" constituted a material breach of the Agreement by Apacheta and justified Lincare's eventual termination of the Agreement without adherence to Section 5.2 of the Agreement because, according to Lincare, the lack of these "aspects" in the software violated the "heart and essence" of the Agreement.

94.     With regard to these allegedly missing "aspects" of the software, Lincare has failed to establish either that they were required under the Agreement or that Apacheta was unable to provide these features.  Specifically, the record shows as follows:

(a) "Patient portal" does not appear in the Agreement, and this topic had not been discussed or mentioned between the parties at any time prior to Ms. Reid's December 3, 2015 email.  Had it been, Apacheta was capable of integrating with a third-party software to allow access to a "patient portal."

(b)  "Directory integration" and "single sign-on" do not appear in the Agreement.  Both, however, had indeed been raised by Lincare as topics during project planning discussions.  In response, Apacheta advised that neither feature was best practice and instead suggested a feasible workaround.  Nevertheless, Apacheta was capable of providing this functionality, if Lincare insisted, as long as Lincare executed a project change request.

(c) While the term "electronic forms" appears in the Agreement, "dynamic electronic forms mapping" does not.  Apacheta provided "electronic forms" as called for by the Agreement.  At no time prior to Ms. Reid's December 3, 2015 email had Lincare ever mentioned to Apacheta that it wanted or needed so-called "dynamic electronic forms

mapping." Apacheta would have been capable of providing "dynamic electronic forms mapping" had Lincare requested it.

(d) The term "inventory and tracking" does not appear in the Agreement. Moreover, at no time prior to Ms. Reid's December 3, 2015 email had Lincare ever mentioned to Apacheta that it wanted or needed "inventory and tracking" as part of the project. Had this been a requirement specified by Lincare, Apacheta was capable of integrating with a third-party software to allow such functionality.

(e) "Scalability" does not appear in the Agreement. Nevertheless, when "scalability" was raised with Apacheta in May 2015, Apacheta advised that its software was, in fact, capable of scaling globally, and the undisputed evidence is that Apacheta has other customers that use its software outside of the United States and with large user counts.

(f) "Route optimization" does not appear in the Agreement. That said, Mr. Wee has testified that when Apacheta demonstrated its software to Lincare pre-contractually, it included a basic level of route optimization and mapping that was accomplished via integration between the Apacheta software and a Google API. (Dep. of J. Wee, at 143:8-155:23). Mr. Wolseifer has testified that he was satisfied that the functionality of the Apacheta software as demonstrated to him pre-contractually would meet Lincare's needs. (Dep. of G. Wolsiefer, at 15:25-16:8). Apacheta was able to provide this level of route optimization to Lincare via integration with a Google API. As for the more robust form of route optimization available on the market called "dynamic route optimization," the record shows that Lincare had contemplated using a third-party software to provide this functionality, including the software used by its parent company, Linde (Paragon/GIST).

Had Lincare pursued this, Apacheta was also capable of providing this more robust level of route optimization via integration with a third-party software.

95.     Of note, the Agreement contains a provision titled "Change of Scope" which sets forth a procedure whereby Lincare could request that Apacheta agree to "Project Change Request" if Lincare truly believed that certain features were necessary but not already within the scope of the parties' Agreement.  There is no evidence, however, that Lincare ever requested a Project Change Request with regard to any of the allegedly missing "aspects" of the software Ms. Reid claimed in her December 3, 2015 email.

### G.     Lincare Improperly Rejects the October 5, 2015 Deliverable and Unilaterally Terminates the Agreement Without Proper Notice and Without Providing Apacheta With Any Chance to Cure.

96.     At no point while he was at Lincare did Mr. Wolsiefer notify Apacheta that it was in breach of any of its contractual allegations, nor did he ever hold the view that Apacheta was ever in breach, nor did anyone at Lincare ever suggest to him that Apacheta was ever in breach. (Dep. of G. Wolsiefer at 35:21-36:10.)

97.     Lincare's 30(b)(6) witness confirms that at no point during the course of the project did Lincare provide formal written notice to Apacheta that it was in breach of any term of the Agreement.  (Dep. of L. Reid at 147:10-148:15, 151:2-4, 154:2-3, 248:8-15.)

98.     Yet in early November 2015, Ms. Reid recommended internally at Lincare that the project be terminated.  (Dep. of L. Reid at 221:14-23; *see also* Dep. of R. Batezel at 26:19-27:6.)

99.     Mr. McCarthy, Lincare's COO, does not recall being part of any conversations or discussions about providing written notice to Apacheta of any breach or about providing

Apacheta with any opportunity to cure any purported breach. (Dep. of G. McCarthy at 30:13-31:3.)

100.    In early November 2015, Apacheta's CEO, Gregg Timmons, wrote to Lincare's COO, Greg McCarthy, to inquire on the status of the project and why Lincare had not formally signed-off on the October 5, 2015 Deliverable. Mr. McCarthy's response did not suggest any problem and made no mention of Lincare's intention to terminate the Agreement.

101.    On February 1, 2016, nearly four months after receiving the October 5, 2015 Deliverable, Lincare's executive management team sent a letter to Apacheta rejecting the October 5, 2015 Deliverable and formally terminating the Agreement ("Termination Letter"). The full text of the Termination Letter follows:

> Dear Gregg:
>
> Reference is made to our recent email communication exchange regarding the current status of the project. As you know, the project included Apacheta's submission of proposed requirements for the software's development, such requirements to be subject to the Lincare's acceptance. Lincare has reviewed the proposed requirements as well as its own expectations of the software's functionality. While Lincare appreciates (and understands it has paid for) the work Apacheta has provided Lincare during the project's inception phase to date, after further review, Lincare has determined such requirements do not, and given the inherent limitations in the project, will not meet Lincare's needs. As such, Lincare does not see a path forward with Apacheta on this project.
>
> Thank you for your consideration. Feel free to contact me if you would like to discuss this matter further.

(Trial Ex. 28, Letter from G. McCarthy to G. Timmons dated Feb. 1, 2016; *see also* Dep. of L. Reid at 218:8-16 ("Q: So I take it this is the official termination letter? A: Yes.").)

102.    The Termination Letter purported to (a) reject the October 5, 2015 Deliverable and (b) terminate the Agreement and, thus, the project.

103.    At no time prior to this February 1, 2016 Termination Letter had Lincare formally rejected the October 5, 2015 Deliverable, nor had Lincare ever provided Apacheta with written

notice of a rejection, let alone a written explanation of the reasons why this Deliverable was unacceptable or an opportunity for Apacheta to cure any alleged issues. (Dep. of L. Reid at 176:22-177:4, 223:24-225-22; Dep. of G. McCarthy at 32:1-4.)

104.    The Termination Letter was the first and only time Lincare communicated its intent to terminate the Agreement; the Termination Letter did not allege that Apacheta was in breach of the Agreement, nor did it identify a breach by Apacheta; and Lincare thus did not provide Apacheta with the chance to cure any breach as none was identified. (Dep. of L. Reid at 147:10-148:15, 151:2-4, 154:2-3; 206:13-207:2, 210:22-211:7, 224:17-225:22, 248:8-15.)

## II.    CONCLUSIONS OF LAW

### A.    <u>Introduction</u>

1.    The Parties agree that Pennsylvania law governs the Agreement.

2.    To establish that Lincare breached the Agreement under Pennsylvania law, Apacheta must demonstrate: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999) (citation omitted); *Gorski v. Smith*, 812 A.2d 683, 692 (Pa. Super. Ct. 2002).

### B.    <u>Lincare Breached the Agreement</u>

3.    First, as one of its express Customer Responsibilities, Lincare was obligated to "work with Apacheta to develop the Acceptance Criteria documents." Although Apacheta sent example acceptance documents to Lincare in January 2015 and then provided a draft set of Acceptance Criteria documents to Lincare in November 2015, at no point did Lincare engage in any effort to develop these documents. Instead, Lincare's only action with regard to these documents came in the form of Ms. Reid's December 3, 2015 email, where Lincare simply

rejected these documents. Lincare failed, therefore, to meet its express Customer Responsibilities with regard to the development of the Acceptance Criteria documents.

4. Second, the Agreement contains a clear and unambiguous "Acceptance of Deliverables" provision at Section 4.3, which required Lincare to review and approve Deliverables in a timely fashion and which provided that the failure to do so means that such Deliverables were deemed accepted within fifteen days after delivery. (Agreement at 3, § 4.3.)

5. It is undisputed that Lincare received delivery of the October 5, 2015 Deliverable on that date, and that both parties understood that this Deliverable would constitute at least a significant portion of the final statement of work as part of the initial Project Inception Phase.

6. In the Agreement, Lincare expressly represented both that it would perform all of its Customer Responsibilities "in a timely and businesslike manner," and this also included Lincare's obligation to "provid[e] all required approvals/failure notices in a timely manner" and to "participat[e] in progress and deliverable reviews." (Agreement at 3, § 4.1; 15, § 3.4.)

7. Lincare also expressly represented in the Agreement that its acceptance of the final statement of work could "not be unreasonably withheld." (Agreement at 9, § 2.)

8. Lincare first purported to reject the October 5, 2015 Deliverable by way of its Termination Letter on February 1, 2016. This purported rejection came more than three months after Lincare took delivery and failed to specify any reasons for the rejection. During the weeks following its receipt of the October 5, 2015 Deliverable, Lincare had repeatedly reported to Apacheta that Lincare was engaged in the process of reviewing these documents. Yet, Lincare now admits that in October 2015, it made the internal decision to put the project on hold, and at some point in November 2015, Lincare had decided it was going to terminate the Agreement, but neither of these decisions was communicated to Apacheta until February 1, 2016.

9.      Lincare, therefore, breached the terms of the Agreement by: (i) failing to review and either approve or properly reject the October 5, 2015 Deliverable "in a timely and businesslike manner;" (ii) improperly rejecting the October 5, 2015 Deliverable more than three months after this Deliverable was received; and (iii) consequently acting unreasonably with regard to its acceptance of this Deliverable and the final statement of work.

10.      Third, in Pennsylvania, conditions precedent to contract termination are enforceable as a matter of law and must be strictly fulfilled by the contracting parties. *Accu-Weather, Inc. v. Prospect Communications, Inc*., 644 A.2d 1251, 1254 (Pa. Super. Ct. 1994); *see also Keystone Dedicated Logistics, Inc. v. JGB Enters*., 77 A.3d 1, 8 (Pa. Super. Ct. 2013).

11.      It has long been the law in Pennsylvania that "where the contract provides a specific means of cancellation or termination, 'neither plaintiff nor defendant can dispense with such manner of cancellation or rescission without the consent of the other.'" *Personnel Data Sys. v. Grand Casinos*, No. 97-4896, 1998 WL 437268, at * 5 (E.D. Pa. July 30, 1998) (citing *Wright v. Bristol Patent Leather Co.*, 257 Pa. 552, 101 A. 844, 845 (Pa. 1917)).

12.      Pennsylvania law requires strict compliance with contractual right-to-cure provisions. *See, e.g.*, *Accu-Weather, Inc. v. Prospect Communications, Inc*., 644 A.2d 1251, 1254 (Pa. Super. Ct. 1994). As recognized by the Third Circuit, "[t]he purpose of right-to-cure provisions is to give [parties] the opportunity to correct unsatisfactory work before their contracts may be terminated. Were poor performance a justification for ignoring such provisions, their utility would be severely undercut." *Milton Reg'l Sewer Auth. v. Travelers Cas. & Sur. Co. of Am*., 648 Fed. Appx. 215, 217-18 (3d Cir. 2016) (applying Pennsylvania law).

13.      Likewise, where parties agree to terms for the acceptance or rejection of performance, the parties must strictly follow those procedures and, as a matter of law, a party's

rejection of performance is ineffective where that party fails to reject according to those agreed terms. *See, e.g.*, *id*. at *10-11 (where software license agreement provided that acceptance was deemed to have taken place five (5) days after installation, the failure to reject in that time period was ineffective as a matter of law).

14.     Here, the Agreement provides that Lincare could terminate only if Apacheta "breache[d] any term of [the] Agreement," and only then if: (a) Lincare provided "thirty (30) days' written notice . . . specifying any such breach"; and (b) Apacheta was unable to timely remedy the "breaches specified therein." (Trial Ex. 2, Agreement.)

15.     The termination and right-to-cure provision of the Agreement is clear and unambiguous, and Lincare failed to adhere to the termination and right-to-cure provision when it terminated the Agreement by way of its Termination Letter on February 1, 2016. Indeed, that Termination Letter failed to even allege that Apacheta had breached the Agreement, and thus failed to identify with any specificity any particular action Apacheta might need to take in order to cure.

16.     Pennsylvania law allows a party to ignore a termination or right-to-cure provision only if "there is a material breach of the contract so serious it goes directly to the heart and essence of the contract, rendering the breach incurable" such that pre-termination notice would be "a useless gesture." *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 641 (Pa. 2009).

17.     As the Third Circuit Court of Appeals instructs, "[a] typical example of a breach that goes directly to the essence of a contract is fraud. Indeed, the only case in which the Pennsylvania Supreme Court found a breach to be severe enough to justify immediate termination of a contract with a right-to-cure provision involved fraudulent conduct by one of the

contracting parties." *Milton Reg'l Sewer Auth.*, 648 Fed. Appx. at 217-18 (citing *LJL Transp.*, 962 A.2d at 648).

18.     Lincare has not alleged or offered any evidence that Apacheta engaged in any type of misconduct, let alone that Apacheta acted fraudulently.  On the contrary, Lincare's witnesses have expressed their belief that Apacheta was "an excellent partner."

19.     At most, Lincare has alleged that the seven so-called missing "aspects" identified in Ms. Reid's December 3, 2015 rose to the level of "material breach" that went to the "heart and essence of the contract . . . ." and justified termination without adherence to the Agreement's notice and cure provision.

20.     The Court finds as a matter of law that even if such allegedly missing "aspects" had been required under the terms of the Agreement and even if Apacheta had been unable or unwilling to provide them, this would not rise to the level of the type of misconduct that would have justified termination without proper notice or a chance to cure, and Lincare has failed to show that any of these missing functionalities goes to the "heart and essence" of the project.

21.     In any event, as already discussed above, the Court finds that Lincare has failed to establish one or more of the following with regard to each of the allegedly missing "aspects" of the software:  (i) that the functionality was indeed missing from the Apacheta software; (ii) that the functionality was previously identified to Apacheta as required; and/or (iii) that Apacheta was not capable of providing the functionality by way of integrating with a third-party software. According, assuming *arguendo* that Apacheta had been in breach with regard to any of the allegedly missing "aspects" of the software, it would not have been "a useless gesture" for Lincare to provide Apacheta with proper notice of a breach and an opportunity to cure.

**C.**     **Apacheta Is Entitled to Its Expectation Damages**

22. Under Pennsylvania law, a plaintiff is entitled to expectation damages measured by the expected benefit of the bargain had the contract not been breached. *ATACS Corp. v. Trans World Communications, Inc.*, 155 F.3d 659, 669 (3d Cir. 1998) ("The preferred basis of contract damages seeks to protect an injured party's 'expectation interest' – that is, the interest in having the benefit of the bargain – and accordingly awards damages designed to place the aggrieved in as good a position as would have occurred had the contract been performed."); *American Air Filter Company v. McNichol*, 527 F.2d 1297, 1299 (3d Cir. 1975) (contractual expectation damages are measured by "the losses caused and gains prevented by defendant's breach.").

23. Here, the Agreement provided for an annual $750,000 licensing and maintenance fee.

24. Mr. Wolsiefer, the authorized signatory of the Agreement for Lincare, understood that the first year's payment of $750,000 would be prorated, followed by fees of $750,000 in both years two and three. (Dep. of G. Wolsiefer at 30:21-31:6.)

25. Apacheta's internal accounting business records reflected that Apacheta expected the value of the Agreement during its initial three-year term to be $2,340,000, comprising $90,000 in professional service fees and three annual software license and maintenance fee payments of $750,000 each. (*See* Trial Exs. 112, 113.)

26. The Agreement also reflects the parties' mutual understanding and expectation that the software would be used by Lincare after the initial three-year term; indeed, the Agreement would automatically renew for one year terms unless properly terminated in advance.

27. The evidence put forth at trial establishes that a reasonable useful life of software is ten years.

28. Lincare paid Apacheta $52,500 in connection with the Agreement, which amount was solely for professional services. Lincare has paid no portion of any of the annual license and maintenance fees. (Dep. of G. Timmons at 195:12-16, 271:7-13; Dep. of L. Reid at 253:2-4.)

29. As a result of Lincare's breaches of the Agreement and termination of the project, Apacheta was deprived of $2,287,500, being the difference between the expected value of the Agreement during its initial three-year term of $2,340,000 and the $52,500 paid to Apacheta.

30. Apacheta was further deprived of its ongoing expected software and license fees for an expected period of seven years after the initial three year term, in the amount of $750,000 per year, for a total of $5,250,000.

31. Accordingly, judgment is entered in favor of Apacheta on its breach of contract claim and damages totaling $7,537,500, plus applicable pre-judgment interest, are awarded to Apacheta.


Dated this 2nd day of January, 2018.

Respectfully submitted,

_/s/ Gregory J. Star_
DRINKER BIDDLE & REATH LLP
Gregory J. Star, PA Bar I.D. 89389
Alex H. Hayden, PA Bar I.D. 314445
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996
(215) 988-2734 phone
(215) 988-2757 fax
Gregory.Star@dbr.com
Alex.Hayden@dbr.com

*Attorneys for Plaintiff, Apacheta Corporation*

<u>**CERTIFICATE OF SERVICE**</u>

I, Alex H. Hayden, do hereby certify that a true and correct copy of **PROPOSED**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** was served on the following by

means of the Court's electronic filing system:

Matthew A. Lipman, Esq.
James T. DiMarco, Esq.
MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
1617 John F. Kennedy Blvd., Suite 1500
Philadelphia, PA  19103-1815
mlipman@mdmc-law.com
jdimarco@mdmc-law.com

Attorneys for Defendant, Lincare Inc.


Dated:  January 2, 2018                           */s/ Alex H. Hayden*
                                                              Alex H. Hayden